Good morning, your honors. James Fossbinder appearing on behalf of the Appellant Lothar Kuster, who is present in court today. I don't, having reviewed what was put in in writing, I don't really have much to add to it. Any questions that you have at this point, I'd be happy to attempt to answer as best I could. What's happened with the historical preservation review? We've never heard anything. How long has it been? Approximately two years. Three years. From the very beginning or from the decision? As I understand it, correct me if I'm wrong, your client applied for a building permit and may have initially been told it was granted. He goes down to get the permit and he's told no, made a mistake. This has to be, because you're in this special area, this has to be referred to the historical preservation people and we'll get back to you. Correct. And as I understand it, your client is still waiting. That's correct. They did send a letter approximately one year ago saying that because he hadn't done anything with regard to his permit, it had expired and they're closing the file. So does that mean he doesn't have an application pending with the planning department now? Correct, as I understand it. So this case is retrospective. Well, if you accept the county's definition, I mean, Mr. Kuster thinks that having a federal lawsuit is doing something about his permit application. I understand, but there's nothing actually pending now. According to the county, no, nothing. So what would they have expected him to do? I can't begin to tell you. From the convoluted record in this case, it seems as though they made up a new thing every day. It was more like every month, I understand, but I don't know. To me, it's just been nonsensical. This is through Alice in Wonderland. And I take it the bottom line is he'd like to get his permit. Yes, he would. And I'd be not putting words in his mouth because he's not permitted to testify here, but I assume that his permit is more important than the lawsuit. He wants to get through the process. Yes, if he hasn't already gotten through the process. And from the record, it would appear at several points he'd gotten through the process, but the permits were sucked back into them. Did this case have any opportunity to go through our mediation program in the Ninth Circuit? Based on my previous history with the county of Maui and this particular trial. Well, yes or no? No. We participated, but it seemed obviously futile. Okay. Well, there's a willingness. Is there a willingness on your side to try to mediate it? Just forget for a moment what you might anticipate. Yes, we would be willing. With reason or not, what the county's response might be. Is there a willingness on your part? Yes. Absolutely. Okay. I've settled most of my cases with Maui County. Anything further or whether from the county? All right. Thank you. Good morning. Madeline Denville appearing on behalf of the four individual county employees. Michael Foley, J.R. Akawa, Tai Furuoka, excuse me, and Charles Villamon, who was sued as individuals in the county of Maui. If I might start by answering the question that Your Honor asked. The last document in this case appears on both referred to in the record on page 178 and also on page 502. The last thing that happened, according to the record, is that on February 29, 2008, the State Historic Preservation Division wrote a letter to Mr. Kuster requesting an archaeological assessment of his property because they were concerned that there were significant archaeological sites on the property. Who would be responsible for that? Mr. Kuster. So he'd have to pay someone to go in and assess? Well, that's correct, yes. He would have to obtain an archaeological assessment. So as a practical matter, how does one do that? Do you hire an archaeologist? What do you get to do that? I would assume so. I'm not particularly knowledgeable myself, but I do think you would hire an archaeologist. How did that come about that the state agency got involved in this? What happens is because the property is by YPO Stream, which is a historic stream, it's in the special management area, which is an area designated by the federal and state coastal zone management acts as an area deserving of special protection. To do any kind of development in those areas, you need to get a special permit, and one of the parts of the permit is determining whether or not they're archaeological. And did he apply for that permit at the outset? He did not because there is an option, and he could have applied for the permit. That would have short-circuited a great deal of this. But there's an option to apply for an exemption, to say my project should be exempt. Right. And to do that, you go through this assessment process, and that's where his permit was at the time that the lawsuit was filed. So you go and you ask the planning director. In this case, at that time it was Michael Foley, one of the defendants. You ask the planning director, please assess my project and determine whether or not I need to get this SMA permit. It could be a minor permit or a major permit. That's kind of irrelevant here. But in any case, so that assessment form, the director then looks at the state law and has to determine whether or not this would be a development. Rather convoluted, if you can indulge me for a moment. So a development is to find there are certain exceptions for development, as Mr. Kuster points out in his brief. A single-family residence might be exempt. However, the director has a further obligation of the state law, which is 205A. The director must determine whether or not there may be a significant environmental or ecological impact. And in order to do that, it's ordinarily, if it's in the SMA area, it's ordinarily sent to review by these various agencies to determine whether or not this needs an SMA permit. Now, it's always the option of the applicant to just forego the attempt to get an exemption and just go straight to the SMA permit process. He asked for an exemption. He did ask for an exemption. So that would mean the director should kick in and do this assessment. Yes. And as part of the assessment process, they contacted SHIP, the State Historic Preservation Division. And on February 29th, as I said, 2008, the state requested that Mr. Kuster do an archaeological assessment. What was it he wanted to build? What they call a farm dwelling, basically a house. This is in the agricultural state and county zoning category. So he can't build a residence, per se. It's agricultural, but you can build a farm dwelling. And that's what his permit was for, a farm. That's what he asked for. That's what he wants. Yes. And what does that have to do with archaeology? What it has to do with archaeology is, because it's in this special management area, which is by state law, you might often think of that as on the shore, but it's not necessarily. This property is not on the shore. It's not necessarily on the shore. It's long ago been designated by lines around all the islands that determine what's in and what's out of the special management area. So this is in the special management area because it's a very rural area, but the streams in this area are significant, and they, of course, discharge into the sea. So there's concern. It's particularly applicable in this case because the initial complaints came up because Mr. Kuster was allegedly improperly grading and dumping refuse and so forth into the Waipio Stream, and his neighbors complained about that. But that's the connection with the special management area. So you can't just build a house in the special management area. Now we've got three things going on here. Yes, you do. I mean, this brief is enough to make your head spin on both sides because of all the procedures. Yes, of course. So now he's up to the director, and then is there an environmental or an ecological impact? Yes. And the next thing we know, now we're looking at archaeology, not ecological or environmental, right? And that's included in the state definition. Of ecology or environment. Yes. It includes historical. And the director still can make this determination, right? Is it ultimately the director's determination to issue or not issue the permit based on the consultation? No. It's the director's determination whether to exempt the project. Correct. So that's within the director's authority, and that's your client. It is within the director's authority, and then if the director makes a decision that the applicant or anyone else is unhappy with, that can be appealed to the planning commission. So I'm sorry to put another layer of complexity. No, no, I mean, of course. But so the director, right now you're saying the archaeology people say he should do an assessment. That's the state. The state archaeology. But that gets kicked in because the director is determining whether or not to grant an exemption. Exactly. He's determining whether or not this is a development. And if it's a development, it doesn't get an exemption. Right. And whether or not it's a development under state law, he's required to determine if it may, it's not a strong standard, it may have a significant environmental or ecological effect. Has anybody sat down and said, here's what Mr. Custer wants to do, and here's what he wants to build, and whether or not this falls within the exemption or not? Has that ever happened? Well, he did field out an assessment form, and he explained this is what I want to build. And then when it went to state historic preservation as part of the review process, the state historic preservation said, we need to see an archaeological assessment. To even determine whether he qualifies for an exemption? Yes, because the way the state law is written, exemptions are the exception, of course. Ordinarily, to do any kind of development in this SMA area, which he definitely is in, you have to get an SMA permit. Is this determined, is it already determined that this farm-related building is a development? Does that qualify? That's the determination. That's the legal question.  The client needs to decide, the director needs to decide. But Mr. Kuster has an option. Mr. Kuster could just say, never mind the exemption. I will just do an SMA. I will ask for an SMA permit and get his information together and go to the planning commission. Because what the planning commission would do at that point is review his project, as Your Honor suggested, and look at it and say, well, you know, we have a little concern about, for example, you're putting your driveway across the stream. Could you do it in a different area? Would they also be in their authority to say, well, but there's also this state agency, this archeology agency. We better have them weigh in. Yes. So we're right back where we started. In other words, whether he goes this route or that route, he's got the same issue. Well, it's a shorter route, in a sense, because if it should be determined that he is not entitled to an exemption, then he's on to the route of getting an SMA permit. So attempt to get the exemption, whether it succeeds or not. If it doesn't succeed, if the director says, I think there may be an impact, then he would go to the SMA permit. Is there any kind of timing? I mean, the state archeology agency can take as long as it wants. Well, it has come up with its determination on February 29, 2008. It did say you need to do an archeological assessment. So that essentially is, Your Honor, playing out the ball back into Mr. Kuzma's court. Any idea what that would cost? I don't have any idea. What's the position of the county with respect to potentially mediating this matter? We're always open to mediation, Your Honor. Okay. Anything else you wanted to add? Your Honor, if I might just briefly, I think we're here because the court below granted summary judgment to the county, and that was based on qualified immunity, which is a distinct issue, as Your Honors are well aware, that none of these four individual defendants did anything to violate Mr. Hooster's constitutional rights. And then from there, she went on to look at the counties. The counties have improper policies, and Your Honors are familiar with the standards for the counties being held to 1983. This is a 1983 claim for constitutional violations. And the claim against Mr. Fukuroku was that he, as a public works inspector, allegedly stepped over the boundary line and onto Mr. Hooster's agricultural lot. And that invoked, of course, the open field doctrine, and the judge, I think, totally correctly determined that that wasn't an unlawful search and seizure because there was no house, there was no curtilage, it was an open field. So that took care of Mr. Fukuroku, the claims against him. So then his disqualified immunity. And then the claim against Mr. Foley was that he had received a couple of letters that were addressed to him. Actually, he didn't open them himself. He testified in his declaration. But a couple of letters went to him from Mr. Hooster complaining, and Mr. Hooster did not receive answers to those letters. And in addition, that Mr. Foley was taking too long on this assessment process. The judge, in a very thoroughly thought-out opinion, said that Mr. Foley was also entitled to qualified immunity. Mr. Arakawa was one of the inspectors, and he was the one who, when Mr. Hooster was called to come and pick up his building permit, and then the clerk realized, oh, it's in the SMA and there's no SMA assessment. And Mr. Arakawa's job was to come out and explain to Mr. Hooster, who was understandably confused and upset, what the SMA assessment process was and how to proceed with it. So those are the allegations of constitutional violations against Mr. Arakawa, and he was also found of qualified immunity on those issues. And Mr. Villalon was also a zoning inspector, and he was alleged he had called Mr. Hooster a couple of times and said, don't do any grading without getting a permit, because you're going to get fined if you do grading without a permit. And that was also, he was granted qualified immunity. So the judge correctly found that none of these actions, alleged actions by the county officials, rose to the level of a constitutional violation on their part, and then looked at the county's involvement. Did it correctly train its people? Was there any policy? Mr. Hooster's initial complaint was that the county doesn't treat people of northern European extraction fairly, but I think she went through each of these individual claims and looked at the facts. So the situation here is, is there a constitutional violation? And I think in this 49-page opinion, Judge Mulway really did go through very carefully each item. And in addition, she gave the plaintiff an additional benefit by saying, I can't quite tell from your complaint if I've hit every point. So I'm instructing the clerk not to enter judgment for, I believe it was 10 days. I don't remember the exact time frame. And I'm giving you, Mr. Hooster, an opportunity to come forward. If there's anything that I've missed, if there's some claim that I haven't addressed in this opinion, then you tell me, and you submit a pleading of a thousand words, and then I will act. But if not, I'm ordering the clerk to enter judgment at the end of that time. So I think she bent over backwards trying to parse out from the complaint what possible constitutional violations there might be. And she found none, and we would urge this panel to uphold her decision. Has his file been closed? I'm sorry. I don't know anything beyond the record on this case. I apologize. Oh, there was a representation that the file had been closed. I did hear that, and that's the first I've heard of it. So as the attorney for the county, you can represent to us that there is a remedy. I mean, if you went to mediation, there is a way that the case could be resolved theoretically. Yes, I'm assuming so. All right. Thank you. Thank you. Anything else, Mr. Fassbender? My concern with mediations is a case previously decided by the appellate court here with regard to my clients, the Hollins and Mr. Sadre. The county agreed to mediation and dragged it out for four and a half years. It's not been a particularly helpful way to solve these problems. Where was that done? I'm sorry. Where did the mediation take place? On Maui County. It was part of a detested case hearing, and we have a unique system over there. Is that a Ninth Circuit mediation? No, no. No, well, we're talking about professional mediators from the Ninth Circuit. I understand that. And they don't drag out for four years. I doubt if they would. No, they wouldn't. I'm pretty sure they would. They wouldn't. And I don't think you'd let them. But that's what happened there. I'm perfectly willing to cooperate in a mediation program involving the Ninth Circuit. Jeremy, what we do is if it's not resolved by a certain period of time, then we resolve the case. Yeah. If I could just make a few other points, and I'm sure we can do that. First of all, there's a longstanding thing that's just shown in the records, which can easily be accessed digitally. The only way you can access them is digitally. And Mr. Kuster went through the records and showed that many, many people after 60 days were exempted from this requirement of having an archaeological survey. And it would make a great deal of sense in his case to have that happen because he had had the exact same lot surveyed by the county, not surveyed, asked for permits and gotten the permits just a few years earlier but decided not to build the particular structure that he was intending to build. In addition, this land has been used for agriculture for over 100 years. There's nothing there that hasn't been plowed and so on and so forth, with the exception of a few small walls near the stream, which Mr. Kuster is well aware of and has a great desire to preserve it historically. As the brief points out, he's been to over 30 Polynesian islands on his own boat and is a great student of Polynesia and a great love of it. There's no evidence whatsoever in the record that anyone ever found anything that Mr. Kuster had ever damaged in any way, shape or form that had anything to do with it. The difficulty is you're trying to squeeze a zoning dispute into a 1983 cause of action. And so the issue, in order for you to prevail on a 1983 cause of action, you have to show that he had a right, you know, a property right to the exemption. And that's a very difficult showing. Let me explain that the SMX exemption is sort of a mythical thing, first of all. The SMX exemption is like the exemption from getting a dog license for your cat, and that's how they dealt with it for many years. This is a single-family residence at the most, and a single-family residence is inarguably, and actually in our documents we show you where the council has admitted this, inarguably not a development as it's defined. So there's no question that he's entitled to the SMX exemption. That's one of the reasons that the behavior... But the district court didn't agree with that. The district court didn't agree with anything I said, as far as I can tell. That's correct. At one point the district court said to me, this must not be in the same SMX zone. It just can't be in the same SMA zone. And I responded that the same council was there. Ms. Dembeaux, we had been involved in the Holland Montana Beach case. That had settled for $10 million. And so I was pretty sure she would have mentioned to the judge if we were in a different SMX or SMA zone. There was no evidence to that at all. I don't know why this went the way it did. But this is a clear-cut case of government retaliation on the part of the employees for using his First Amendment rights to complain about the fact that his neighbors were allowed to illegally build a house that is illegal in every imaginable way. And his complaints were met with complete deaf ears. And yet he was retaliated against clearly. There are many, many examples in the record of people who got their permits without the approval of the archaeological folks. This was a made-up thing at the end. And if they're allowed to do this, they can go on forever. And they've already come pretty close. Thank you. All right, thank you. Thank you, counsel, for your argument. Cooster v. Foley is submitted.
judges: Hawkins, McKeown, Rawlinson